Good morning, Your Honors. The case before this Court is a relatively simple one, I think. Two or three issues, all legal issues, from a petitioner's point of view. I'll begin by calling attention to the Court that this is a decision rendered by Judge Ignacio P. Fernandez in San Diego. And Judge Kleinfeld, you just made a statement moments ago that the law is the law. We cannot make it different for different people. And that's a key principle in this case. Two main issues. Number one, Judge Fernandez made a frivolous finding, in this case a faulty finding that violates law, regulation, and frivolous application. Do you mean the frivolousness finding? Let me ask you something about that. Why aren't we required to hold that the applicant received his warning about frivolousness that the regulations require because it's written right on the application and also at page 154 that he received it? Well, an application is one way of looking at the conveyance of the warning. However, Congress, in all its wisdom, wrote the law. And that law requires that at the time of the filing of the application, the warning must be given. Well, isn't the record that – I would be troubled for only on the piece of paper in English, but isn't the record that the application was read to him in his language? That the application... The application with the warning was read to him in his language at the time of the application, isn't there? I don't know that. There's no indication of that in the record. What about page 154 in the transcript where the judge says if he wants me to consider with considering the – if he wants me to continue with considering the asylum application, I'm going to make a frivolous finding? This is the warning which I believe was properly explained to you before, but I'm going to explain it to you again because of the severe consequences of this. If you knowingly file a frivolous application for asylum, you will be barred forever from receiving any benefit. And then the judge turns to the interpreter and says, I want you to translate that, please, under the Immigration and Naturalization Act, a frivolous application for asylum is one which contains – he goes on with that. Why isn't that the oral frivolousness warning? Well, there's several reasons. Number one, Congress wrote the law and required that – if you will – section 208, small letter D, number 4, capital A of the Immigration and Nationality Act. At the time of filing of an application for asylum, the Attorney General shall advise the alien, et cetera. At the time of filing of an application for asylum, the regulations repeat this warning and that requirement. And this Court recently ruled in November of 2003 in the case FARAH, F-A-R-A-H, v. Ashcroft, this is case number 0270252, exactly the same circumstances with the same immigration judge, that the frivolous warning cannot be given in the middle or at the end of the hearing. Why? Because that is one of the safeguards that Congress wrote into the law. If the judge is not going to obey the law that Congress passes, how can anyone else? This is a law for everyone, not a particular judge. Just that citation one more time. Just the citation that you just read. What is it? I have copies for the Court. Okay. I thought that the way the Attorney General gave the warning at the time of filing was by printing it on the asylum application. No. No. We have no indication that the warning was given to him in his own language or in any language. This is not a man who was fluent in English. He could hardly speak English. All right. So let's test. If we were to deal with the frivolousness substantively, what would you say about that? Substantively? I suppose we thought it was adequate notice. Is it frivolous? Does this meet the standard of frivolousness? It really doesn't matter. I understand. Why don't you get on to the main case? The frivolousness that falls when the case warrants. One more moment about the issue of frivolousness, because that is such a very important part of this case. This individual is now married to a U.S. citizen. They are contemplating raising their children in the United States. His parents are immigrating to the United States within one month. His key part of his family is here in the United States. The frivolous finding precludes this man from ever living lawfully in the United States. He must be deported. He could never come back. Justice cries out that you vacate, at least vacate that part of the judge's order, because it is illogical, it is wrong, it violates law, regulation, and your rulings. That's what I have to say about frivolousness. Could you direct some remarks to the substantive issue of whether he told an entirely different story in Greece? Okay. He may well have done that. We do not object to the government bringing in impeachable evidence at the end of the trial. That's the government's right. That's what trials are  for. That is what evidence is for. What we object to and what the attorney who represented the Petitioner at the time of hearing objected to was that the judge refused and failed to provide a meaningful opportunity for the Petitioner to respond. I will point you to the record. I believe that the judge says, well, the attorney objected. I believe I need time. You're battering us with this evidence. And the judge later said, I'll give you five minutes. I'll give you five minutes to review with your client how you're going to respond to all of this massive impeachable evidence. But he did know before. I forget exactly where, but I picked up in the record that the fact that he had told a different story in Greece was no surprise. That may well be. But the government knew it, right? Well, we're not disputing those facts at all. What we are saying is if the Petitioner's counsel is precluded from I mean, one thing that's a little confusing is that you were disputing it. I mean, until you started up here today, my understanding was that you were disputing it. You were – there was this whole long story about Basil and how Basil had made it all up. I think that the key – the reason that we have appealed this case is because the judge violated the Petitioner's constitutional due process rights to a full and fair hearing. Now, we could argue about the You know, it happens in so many jury trials. Somebody tells a story. There's some devastating impeachment. They might like a two-week continuance so that they could come up with something to deal with it. They don't get it. They're lucky if they get a recess. I will simply state that the government two days ago filed with this Court and with our office a copy of a decision that is not a Ninth Circuit case, Nyama, N-y-a-m-a, versus Ashcroft. And in that case, under very similar circumstances, the immigration judge granted six months' continuance to respond to the allegations raised in the impeachable evidence. But this is what I'm having trouble with. These were not new allegations. The fact that he had told this completely different story in Greece was one of the reasons why he was refused – his asylum application was refused in the first place, was it not? In the United States? No, that is not right. I believe it is right. It is not, because the evidence only came to light about, from what I can gather, 10 or 15 minutes before the judge rendered his decision. That's not my impression, but I can't really show you where. In reading through the record, and I thought you agreed earlier, the fact that he had told a – not the case is a paper, but the fact that he had told a different story in Greece was common ground going into this hearing. No, it was not. In fact, he wouldn't even tell – You know he told a different story in Greece. It can't have been news to him. He would have known he told a different story in Greece, and if he was straight with his lawyer, he would have told his lawyer about it. Now, a lot of clients aren't straight with their lawyers, and that makes it tough to defend them, but he's chargeable with that. I don't disagree with His Honor's conclusion. He had to have known. I wouldn't stand here and tell you that he didn't know. However, the immigration judge did not know. You can tell from the judge's reaction when the government introduced the evidence into the record. The judge was basically taken aback and shocked. All right. There is here the – there's a document dated February 12th, 1999, on page 215, which seems to be the asylum officer's review of his second asylum application. And it says that on October 18th, 1994, he was interviewed for refugee status at the United States Embassy. Interview notes by an immigration officer indicate that the applicant was in Turkey from 1991 to 1994. So why is that not – and that was the basis for the – for the administrative refusal of the asylum. So it was in there from the beginning. This, I am not sure, Your Honor. Well, I'm reading to you. I'm not making it up. No. I have read the document. I understand about the document, but I don't know that the immigration judge was aware of this document. That's not the question. The question is whether the defendant was aware of it. You mean the Petitioner? I mean the Petitioner. I'm sorry. The Petitioner had to be aware of it. He was at that examination. Quite apart from that, that he was aware that the government knew about it, and this is why they were refusing the asylum, or one of the reasons why. Yes. Okay. You know, if he's aware of his problem with the changing stories, I don't see how he can be denied due process. I guess we come from different contexts. I come from a jury trial context, and you from an immigration law administrative hearing context. You hope that the jury will be surprised and interested in the impeachment. It's nevertheless not likely to be news to the person who changed his story. Well, if I'm not mistaken, the Ninth Circuit has held time and time again and reversed so many board decisions that a Petitioner must be granted a meaningful and reasonable opportunity to explain discrepancies and inconsistencies in the record. And I don't believe that granting a five-minute recess comports with the Ninth Circuit's requirements. May I ask one other question? Is there a convention against torture claim in this case? There was, yes. Was it addressed by the IJ and the BIA? I didn't find it. Was that? I don't think that's in the points before us in the blue brief, is it? It may not be. I don't remember it. I thought at the very end that you did ask for relief on the convention against torture claim. Judge Noonan, you have no questions? I will not comment on your performance. Thank you, counsel. Thank you. May it please the Court, Donald Kuvion for the respondent. Your Honor, if I may answer a question that Judge Berzon raised a few moments ago in regard to when the Petitioner, when the record shows the Petitioner was aware that the agency knew that there was a problem with a discrepancy between what was said in Athens and what was said here. The record shows that that did occur at the interview with the asylum officer. And it shows it in two ways. It shows it in the assessment that was written by the asylum officer in which he specifically denies the application because of a discrepancy between the date, the dates that the Petitioner, by the time he got here, says he left Iraq. And when he was in Athens, the date was in 91. That's the piece I was just reading. All right. All right. In addition, I would like, apparently it's been overlooked, there is an exhibit that was proffered. It is a letter that was written soon after the asylum interview to the asylum officer by the Petitioner's cousin, and then the Petitioner offered it in evidence. Where? That, Your Honor, is at page 247 in the record. This is Mr. Jebo, and he is writing on March 18, 99, immediately after the interview to make the officer aware that these discrepancies are known and that he will address them, and that they were discussed with an association that assisted the Petitioner in filing, writing his application, and that they decided after, after looking at everything, they decided, they said, to go with the facts. Can we go to the frivolousness? The two things I'm interested in are the frivolousness determination and whether there is any compensation against torture issues still hanging out there or not. As to the frivolousness, what notice would you rely upon as required by the statute? In this record, there are two. One is an English-written statement in the application. Are you relying on that as adequate to somebody who doesn't speak English? That's when, on this record, it was first made. So you would argue that just putting that notice in an English application – I'm just trying to figure out what your argument is – that in general, an adequate notice is putting it on the piece of paper that he signs in English? Well, it certainly knows. Well, not if he can't read it. I don't know if not. Maybe yes. But I just want to know what your argument is. Is that your argument? Well, Your Honor, the application is only in English. I understand that. But usually it's – so you don't think there's any requirement implicit in the statute or in due process that we know that it was read to him in a language he could understand? We don't know, unfortunately. And there's no requirement. You would argue there's no – is your argument there's no requirement that that be true? Well, I don't know that there's a requirement. But I do know that when Petitioners come in for hearings with the agency on these applications, that if an interpreter is needed, that there is an interpreter. Oh, I understand that. But I'm asking you whether this notice was – is there any record, anything in the record to indicate that this notice on the application was in fact read to him in English? In his language. At the asylum officer interview. No, there isn't. All right. So then the next thing – so either you're relying on the fact that it's okay, although it was read to him in English or in his language, or you're relying on what happened at the hearing. Those are the two possibilities, right? Yes. Okay. So which one is it, or both, or what? I'm having trouble here. I'm sorry. Which one is it, or both, or what? In other words, what notice are you relying on? That's all I want to know. I'm relying on both, Your Honor. So you're relying on the English language notice in the application? Yes. And on the post hoc notice? Yes. All right. Is your opponent correct? I have not read the case that there is a case saying that the post hoc notice isn't adequate? That's what the case says. All right. So we're bound by that, so we eliminate that one. So now we're back to this English written statement, which we have no reason to think he understood. Is that right? Well, by the time – well, no, we don't. We don't. But we do know that at some point after he gets into the United States, his English – he gets some confidence in his English. Fine. And so? We have – there's nothing to indicate that the interview was not in English with the asylum officer. Actually, I thought it was signed by a translator. No? I'm fearful that we're confusing. The two applications? It's possible. Yes. We're confusing Athens with Anaheim. That's possible. Where is that application in the record? Do you know that? The asylum application in the United States – it's the only asylum application – is at 299, and the refugee application from Athens is at 183. Now, of course, they're both asking for the same thing in essence, so it really doesn't matter what we – they call them refugee asylum. Now, he checks on the application. I'm not following in English. Do we know when he came to know English? I'm sorry, Your Honor? Is there any – do you have any data as to when he came to know some English? No, Your Honor. You know, I was surprised. I look at your brief at page 32. Did you write that brief? I did not. Oh. Well, I guess you've got to take it as part of the – I'm not disowning it. I'm here for the government. You say his knowledge of – the brief says his knowledge of English is highly relevant to his credibility. Given the fact that he claims not to have known the contents of the declarations that were prepared by Basil. Well, now, of course, there's no evidence at all that he knew English in Greece, and that's the whole issue as to what Basil said. Actually, Your Honor, to be candid with the Court, the evidence – well, this record indicates that in Greece he was not fluent in English. All right. So it's not relevant. Only if – I mean, it was perfectly capable for the counsel for the service to say, well, when did you learn English? But he didn't. So there's nothing to refute his claim that in Greece and when the – he knew nothing of it. He kept saying, I didn't know what was in it. So how can it be highly relevant? It's not. Well, I would not agree with that. I'm sorry. I thought you were abandoning the statement here that it was highly relevant. I am. You are. When I said I don't agree, I meant with that statement in Greece. You don't agree. Okay, good. That's not a problem. The government loses nothing by occasionally saying we made a mistake. I learned that long ago, Your Honor. Right. Suppose we – if the frivolousness notices were adequate, what is your argument about, substantively, why the frivolousness determination is adequate? I understand, Your Honor's question. It's in regard to why is the printed warning sufficient or not? No, no. I'm now getting – I'm not talking notice anymore. I want to know, assuming the notice was adequate, why should – why is the IJ's conclusion that this was a frivolous application, given the standard, one that we ought to leave in place? Well, Your Honor raises the weakest point in the government's case. And there's no doubt. I raised it. Go ahead. Because I understand a frivolousness standard to not just be this is a very bad application, but one that was filed – I forget what the exact language is, but essentially a fraud or a – What the IJ did was to define that what you alleged in Athens disagrees with what you alleged in the United States.  And so the IJ's conclusion is, therefore, that is fraudulent. He's talking about this application as being the frivolous one, not the one – not the one in Athens. Right. But he's finding that because he finds the Petitioner incredible. But that would lead to the conclusion that any time there was a credibility determination, you would have a frivolous application? But it's – but they relate, Your Honor. He finds him incredible because he doesn't believe the answers he receives or gives, I should say, on cause examination at impeachment. Well, the standard actually, as I have found it, is for purposes of this section, an asylum application is frivolous if any of its material elements is deliberately fabricated. All right. Does fabricated mean a lie or does it more – ought we to take it and mean more like a forgery or a, you know, a manufacturer of evidence as opposed to somebody just getting up and telling a lie? Because if we take the second, every case in which there's an adverse credibility finding can lead to a finding of frivolousness, no? It would appear. Well, what about not here? What about in general? What standard – we have no cases on this standard, as I understand it. Is that right? Yes. Okay. So we need to give some thought to how we're going to interpret it. And my question is, if we interpret it in this case as being sufficient, why are we – how are we going to distinguish the next case in which there is a credibility – an adverse credibility finding? Why isn't that also a frivolous application? I don't know is the answer. In this case, you've got – you have to take both the written and the oral in union to find that there is a sufficient warning. The written warning – well, I'm going to get in trouble here, but it does not define what is frivolous. And the Petitioner, I believe, made some mention of that in the brief. The regulation – The written statement doesn't say what frivolous is. That's correct. It doesn't even say this much. It doesn't say – It just says if you do – if you follow frivolous. But it doesn't say if any of the material elements – it doesn't use the definition.  It does not – it does not articulate anything beyond that. It does not address what is a frivolous application under the regulation. Are you coming very close to confessing error under frivolousness? Because it might be nice if you did and we didn't have to decide it. I'm going to tell you to do it, but if that's what you mean to be doing, then you should do it. Well, I'd indicate, Your Honor, that this is our weakest point and that it is necessary to take both warnings in order to find a sufficient warning. But the second warning we know is out under our new case law. Yes. So I understand that you're basically saying under our case law, this notice wasn't going to be there. As it appears that I've been unhorsed, shall we say. The government would not – Do you want time after argument before we submit the case? It looks to me as though there's probably an application coming for a change of status on account of the marriage and the frivolousness is, as you say, the weakest point. It looks as though there may not be much to fight about here. Do you need any time to just reach a stipulation as to the result and a stay and withdrawal of the appeal in order to avoid having us decide it? I certainly wouldn't reject something like that out of hand. Certainly we would, if Your Honor would like us to discuss that, I certainly would. I'm not suggesting it to you, but if you want it, it's something that we will consider among ourselves. Alternatively, you know, our mediation office is now involved in – our mediation office is now involved in mediating INS cases. Yes. Maybe they could help you just come to a conclusion here, because we seem to be fairly close to one. The problem, as I see it, in this case, is the frivolousness finding, because that is the one that gives this Petitioner a problem that he can't overcome. But the denial of asylum doesn't prevent him from – No, we understand that. We're just saying in terms of getting this case decided, either getting the frivolousness thing out of there, if you were willing to do that, dealing with the adjustment of status and getting perhaps the appeal and the asylum withdrawn, because that seems to me what I'm hearing pretty much. We may be able to get a mediator involved if you need one and just finish this. I'm thinking any time we can avoid making law, it's probably a plus. And I would think an institution would be able to take that squarely. Let's try.  I would certainly try. I would not object to or resist such an endeavor. Thank you, counsel. Since I was throwing out a bouquet to counsel for the Petitioner in the previous case, let me say that you were one of the best representatives of the United States I've heard in an immigration case. Well, thank you, Your Honor. I don't know if I deserve that, but I appreciate it. I would like to commend counsel on both sides for their candor and helpfulness. I have down here Mr. Vandestein was arguing. Who are you, in fact? My name is Kubion, Your Honor. What's that? Kubion. How do you spell that? C-O-U-V, Victor, I-L-L-O-N. Thank you. Thank you. We went way past time. May I submit the copies of the decisions as well? Give them to the clerk and he'll get them to us. Thank you, counsel. Rather than declare the case submitted, we will decide at conference what to do about it. Thank you, counsel.
judges: Noonan, Kleinfeld, Berzon